65 A.3d 846

JANET HENEBEMA, PLAINTIFF–RESPONDENT/CROSS–APPEL-LANT, v. SOUTH JERSEY TRANSPORTATION AUTHORITY AND NEW JERSEY STATE POLICE, DEFENDANTS–APPEL-LANTS/CROSS–RESPONDENTS, AND MICHAEL R. TESTA, MARIA E. PEREIRA, DOMENICO RADDI, JR., JOSHUA COO-PER, REY S. COOPER, TROOPER C. DEANGELIS, TROOPER M. RAZUKAS, DEFENDANTS.

Superior Court of New Jersey
Appellate Division

Argued February 4, 2013—Decided April 1, 2013.

Before Judges PARRILLO, SABATINO and FASCIALE.

*Stephen M. Orlofsky* argued the cause for appellants/cross-respondents (*Blank Rome, L.L.P.*, attorneys; *Adrienne C. Rogove, Bruce M. Gorman, Jr.,* and *Mr. Orlofsky,* on the brief).

*Christine D. Petruzzell* argued the cause for respondent/cross-appellant (*Wilentz, Goldman & Spitzer*, attorneys; *Ms. Petruzzell* and *Alex Lyubarsky,* of counsel and on the brief; *Amy Herbold* and *Corinne McCann,* on the brief).

The opinion of the court was delivered by

FASCIALE, J.A.D.

Defendants South Jersey Transportation Authority (SJTA) and the New Jersey State Police (NJSP) (collectively referred to as "defendants") appeal from a judgment in plaintiff Janet Henebema's favor, entered after a jury trial, and an order denying their motion for a remittitur. Plaintiff cross-appeals from an order denying her request for pre-judgment interest pursuant to *Rule* 4:58–2(a)(2).[1]

■ The parties contested the predicate facts relevant to determining whether defendants either exercised discretionary decisionmaking or performed ministerial acts, a distinction central to applying the correct standard of liability under the New Jersey Tort Claims Act (the Act), *N.J.S.A.* 59:1–1 to 12–3. The structural question before us is whether a judge or jury resolves that threshold dispute. We hold that when the evidence establishes a genuine issue of material fact regarding whether the alleged failures of a public entity were the result of discretionary decisionmaking as to how to use its resources, or instead involved ministerial acts mandated by law or practice, then that fact issue must be submitted to the jury. The resolution of that factual dispute will guide the jury in applying either ordinary negligence law or the Act's "palpably unreasonable" standard. *N.J.S.A.* 59:2–3(d). Because the judge himself settled that fact-laden dispute here and charged a potentially erroneous standard of care, we reverse the judgment on liability and remand for a new trial. We affirm in all other aspects.

## I.

On December 4, 2005, between approximately 3:05 a.m. and 4:28 a.m., at least eight accidents occurred on the Atlantic City Expressway (the Expressway). Plaintiff's right leg was severed as a result of an accident that occurred near milepost 7.3. Four NJSP

---

[1] The attorneys on appeal were not trial counsel.

troopers were on duty that morning patrolling approximately a forty-four mile length on the Expressway. Troopers Christopher J. DeAngelis and James A. Clay patrolled in one police vehicle, and Troopers Bernard Tennant and Rod Nicholson patrolled in the other. According to an SJTA witness who testified at trial, no adverse weather conditions had been forecasted for the night in question. The morning, however, turned out to be hectic and chaotic due to unexpected poor weather conditions and the numerous accidents.

The first of several 9–1–1 calls to SJTA dispatch operators reporting four accidents at the scene where plaintiff was injured was made at 3:55 a.m. by Joshua Cooper, after he was involved in a single-car accident at milepost 7.3. Cooper reported that no injuries were suffered, "but [that] the car is kind of in a really bad spot [and] we can't move it." Cooper added that "[t]he car [is] sitting on the left, not moving."

Dispatcher Jeremiah Conner, of the SJTA, took Cooper's call and inquired whether Cooper hit a guardrail. Cooper responded, "No, hydroplaned on the snowy ice." Conner then asked, "[are] you[ ] in a bad ... location?" Cooper replied: "Well yeah, [we are] like on the left, like right up like we slammed into the middle section thingy. . . . It happened in the left lane so we need to get it out of here." Conner ended the conversation by saying, "Ok[,] we'll get somebody out there[,] alright?" The transcript of that call includes several "[i]naudible" references, and includes the statement, "7 eastbound hit the guardrail[,] no injuries[,] it's in the left lane." In the same call, the dispatcher referred to another accident at milepost 16.2 west with one vehicle off the road.

At approximately 4:18 a.m., Conner received a call from Atlantic Cape MedCom.[2] The caller informed Conner that her supervisor at MedCom had just reported a subsequent two-car motor vehicle accident "at the 7 south exit." Conner responded, "Yes[,] we have

---

[2] MedCom is a separate dispatch call center unaffiliated with defendants.

that [and] we're getting somebody out there[,] we just have a lot of accidents right now."

At 4:22 a.m., Conner dispatched Cooper's call to the NJSP. Dispatch operator John Travis, who was also on duty that morning, testified that there was no dispatch call indicating that they were now also dealing with a two-car accident at milepost 7.3.

When Cooper's 3:55 a.m. call came in, one call was already "stacked," or piled up, because the four patrolling troopers were diverted to other accident locations. For example, at around 3:05 a.m., Troopers DeAngelis and Clay responded to an accident at milepost 26 and remained at that site until approximately 4:00 a.m., whereupon they proceeded further west to handle an earlier non-emergency call. Around the same time, Troopers Tennant and Nicholson responded to a vehicle accident at milepost 16.2 involving one fatality. While the troopers were at those accident scenes, four additional accidents occurred in succession at milepost 7.3 in the westbound lanes, one of which involved plaintiff.

Milepost 7.3 has a gradual incline that passes over the Garden State Parkway. A driver must reach the crest of the incline before the other side of the Expressway is visible. The four accidents occurred about 350 feet beyond the crest on an allegedly icy road surface. We discern the following facts regarding these four accidents, mindful that the disputed aspects of those facts will be relitigated at a new trial.

The first accident occurred at approximately 3:55 a.m. and involved the Cooper vehicle. Cooper traveled at approximately fifty-five to sixty miles per hour, reached the unsafe road surface, and lost control of his vehicle. His vehicle slammed into the Expressway's concrete median barrier and came to rest facing east at least partially in the far left westbound lane. Cooper activated his high beam lights, he and his passengers exited the vehicle, and they ran to the side of the Expressway. The troopers were unable to respond to Cooper's 9–1–1 call because they were at other accident scenes.

Approximately ten to fifteen minutes later, a second one-car accident occurred involving a vehicle driven by Michael R. Testa. Like Cooper, Testa approached milepost 7.3 and lost control of his vehicle, which stopped horizontally across the middle and left lanes of the three-lane westbound Expressway. Testa and his passenger exited his disabled vehicle and then Testa called 9–1–1. The troopers remained unable to respond due to other accidents.

Other drivers traveling westbound on the Expressway reached Cooper and Testa's disabled vehicles and successfully passed them using the right lane. An ambulance driver then happened on the scene, stopped in the middle lane, and activated the ambulance's emergency lights. Other drivers managed to pass the ambulance and disabled vehicles using the right lane. Before another accident occurred at the scene, defendants rejected emergency assistance that the Egg Harbor Township Police Department (Egg Harbor PD) offered to the NJSP.

A third accident then occurred at approximately 4:25 a.m. involving plaintiff's vehicle. Plaintiff was traveling in the middle lane, observed the flashing lights, and attempted to pass the ambulance on its left. Plaintiff's vehicle then collided with Testa's vehicle. Because her driver-side door was wedged against the concrete barrier, plaintiff exited from her passenger-side door and then stood on the Expressway.

A few minutes later, the fourth accident occurred, tragically injuring plaintiff. Domenico Raddi, Jr., approached milepost 7.3 at approximately fifty-five to sixty miles per hour, and his vehicle struck plaintiff's car and plaintiff while she was standing on the Expressway. The fourth accident occurred before troopers arrived at the scene. The computer-assisted dispatch (CAD) system data showed that the first police officer arrived at the scene at approximately 4:43 a.m., fifty minutes after the Cooper accident.

As noted, there were numerous calls coming in reporting accidents along other areas of the Expessway as well. There were three SJTA dispatchers on duty that morning, including Conner, Travis, and a supervisor, handling approximately eighty-eight

transmissions during the relevant time period. As is the usual procedure, SJTA dispatch operators receive 9-1-1 calls, obtain information from the callers, enter it into the CAD, and then broadcast that information to the troopers on duty.

According to New Jersey Standard Operating Procedure F41 (SOP 41):

A. It is the responsibility of all enlisted and civilian radio and Public Safety Telecommunicators (PSTs) to obtain as much information as possible concerning the nature of a call for assistance/service prior to dispatching a trooper(s). Where information necessary to determine the nature of the required response, i.e., emergency or non-emergency, is not available, enlisted and civilian radio and Public Safety Telecommunicators shall advise the responding trooper(s) of same (e.g., unknown on injuries, unknown on traffic hazards or other hazardous conditions).

B. If enlisted and civilian radio and PSTs receive additional information pertaining to a call for assistance/service while a trooper(s) is responding to a call, such information shall immediately be dispatched to the responding trooper(s).

SOP 41 further required that troopers dispatched to the site of an emergency "respond to the scene of the crime, accident, or other incident, without delay, as quickly as possible, by the most direct means."

SOP 41 also classified calls for assistance/service in terms of priority:

I. Emergency Calls for Assistance/Service
 a. Trooper in need of assistance (station in need of assistance)
 b. Robbery in progress
 c. Burglary in progress
 d. Crime involving a deadly weapon in progress
 e. Crime resulting in death or serious injury
 f. Riot or large disturbance involving threats of violence, fighting, or injuries
 g. Motor vehicle crashes/incidents resulting in injuries
 h. Motor vehicle crashes/incidents resulting in potential traffic hazards
 i. Motor vehicle crashes/incidents resulting in hazardous material leaks
 j. Residential/Commercial alarms and 911 hang-ups

II. Non-Emergency Calls for Assistance/Service
 a. Property crimes/damage complaints
 b. Minor motor vehicle crashes/incidents not resulting in injuries, traffic hazards, or other hazardous conditions

### c. Motorist aids

At trial, there was a difference of opinion as to the nature and import of SOP 41. James Aaron Williams, plaintiff's expert in the field of law enforcement policies, practice, and dispatch training procedures, testified that where those procedures indicated "shall" or "will," there was "no discretion, and it's already been thought out and you simply do it," and weather conditions did not change those commands.[3] "The dispatch service is required and mandated to put out over the airwaves all the information that they receive" from incoming calls "immediately," and "particularly emergency calls." The dispatchers must ask about and convey all information about injuries, and about "hazardous conditions on the roadway, such as cars being stranded on the highway, trucks blocking the passageway, vehicles facing the wrong way in one-way traffic[,] and things of that nature."

According to SOP 41, section III, "Dispatching Calls for Assistance," the dispatcher must constantly dispatch to the troopers to "keep ... him or her constantly updated on the traffic conditions." The dispatchers must also update the troopers if additional information comes in while troopers are responding to a call; "the police officers on the road receive their information and updates in an immediate fashion from the dispatcher." Williams further opined that dispatchers did not have the discretion to decide which calls are fit calls to broadcast; they must dispatch everything when they get it.

Williams conceded, however, that there was no written requirement that duplicative calls must be broadcast. He also acknowledged that the decision to split troopers into separate cars involved a discretionary judgment and that a portion of SOP 41 (section II, subsection b) was a "guide." Indeed, SOP 41 is labeled as a "guideline."

---

[3] Williams was the only liability expert that the court qualified. Numerous defense witnesses offered lay opinion testimony.

Travis agreed that the troopers were doubled up in units after midnight, and it was within the shift commander's discretion to allow them to be split up into separate cars. Travis also testified that tow trucks would not be sent to a location before a trooper could arrive if the incident involved an accident that required a trooper's investigation before a vehicle should be moved.

Sergeant Karl Kramer of the SJTA, who supervised the dispatch operators on the morning of the accidents, concurred that as to "mutual aid, whether or not to call the locals for assistance, whether or not to split troopers after midnight, [and] towing procedures," were "all discretionary on the trooper," and informed by the trooper's training and experience. At 4:10 a.m., Egg Harbor PD called the SJTA and offered assistance to the troopers. Sergeant Kramer asked the dispatch operators what they usually do when a local police department offers to assist them, and Dispatch Operator Robert Buccilli indicated that they usually first accept police assistance from the nearby airport. The sergeant then declined the mutual aid from Egg Harbor PD and called for police assistance from the airport. In doing so, he allegedly followed the SJTA unwritten procedure. The sergeant also requested that additional troopers from the next shift arrive early to assist the troopers on duty.

As to mutual aid, Robin McKaig, the SJTA communications superintendent, did not know of any written procedures of the SJTA for handling mutual aid requests. SOP 41 is silent on this matter. According to McKaig, the local police generally would not be called upon to assist when more help was needed; the SJTA would usually first seek help from other State Police troopers barracks, from Belmar, Buena, the airport located at milepost 9, or the Garden State Parkway. Even Williams, plaintiff's expert, agreed that the SJTA's practice was to call the airport or other State Police barracks when they had emergency needs, or to call in troopers from other shifts.

Furthermore, Jeffrey Anderson, a Sergeant First Class trooper, who was the Assistant Station Commander at the Expressway

(the highest filled position at that post), explained that State Police policies statewide did not have any written SOP, nor any verbal policy or procedure, regarding mutual aid. If additional assistance was needed, the midnight shift troopers would break up into two cars, or troopers would be called in from another shift or another station. Anderson would not call in local police officers as first responders, "especially on a road like the Expressway" because "there are too many things that can go wrong" particularly because the police radios were incompatible so communications would only be possible by going through the third-party dispatchers.

As to the dispatcher's duty to dispatch that the milepost 7.3 accident was a priority, McKaig explained that when a call came in, a dispatcher was responsible to gather "[a]s much information as they possibly can" and "as fast as they can before the next call comes in." According to McKaig, a dispatcher then dispatched the information to the State Police, maintenance personnel, or animal control officers. If multiple calls came in regarding the same incident, the first would be dispatched, but "[w]e don't continually dispatch the same call out over and over and over again."

With respect to the execution of the dispatcher's duty in the instant matter, Travis testified that "[i]t would be hard to determine" what priority he would have given to Cooper's call:

> If his car was up against the center median[,] that's a three-lane highway down there.... [T]here's still two other ... roads and a shoulder that people can drive by. It's kind of hard to say. There's no injuries. He didn't hit a guard rail.... I would just give it out ... [as a] report of a motor vehicle accident on 7 westbound, [a] vehicle up against the median.

While agreeing that Cooper's accident created "a traffic hazard," Travis indicated that Conner's approach was correct, to convey all of the information to the troopers and "[w]hether they handled it as a nonemergent or emergent, [is] up to them." Travis further explained that if troopers are not available to address a call, the sergeant at the desk is made aware that calls are being stacked. Then, if a trooper cleared work on a particular

accident and others were stacked, the dispatcher would advise the trooper about the outstanding matters, indicating the priority matter. If all the stacked items seemed to have the same priority level, they would all be conveyed and the trooper could advise which call would be addressed next.

In March 2007, plaintiff filed her complaint against defendants seeking compensation for her pain and suffering and economic losses.[4] In October 2009, plaintiff filed a $5,000,000 offer of judgment against defendants, pursuant to *Rule* 4:58–1. Defendants rejected plaintiff's offer and the matter proceeded to trial.

The judge conducted a jury trial on fourteen days between September 2010 and October 2010. Plaintiff contended during trial that defendants failed to (1) accept the mutual aid offered by the Egg Harbor PD; (2) split up the troopers into four police cars; (3) dispatch troopers properly; and (4) dispatch tow trucks timely. The judge determined that these alleged lapses involved ministerial acts which defendants were mandated to perform and therefore charged the jury solely on ordinary negligence principles. Although the parties sharply disagreed on the predicate facts regarding whether defendants' actions were discretionary or ministerial, and even though the judge himself recognized that some of defendants' conduct was discretionary in nature, the judge did not submit the factual dispute to the jury.[5]

---

[4] Plaintiff also sued Cooper, Rey S. Cooper (the owner of Cooper's vehicle), Testa, Maria E. Pereira (the owner of Testa's vehicle), and Raddi. Plaintiff settled with Pereira, and the jury returned a verdict of no cause of action in favor of Cooper, Testa, and Raddi.

[5] We note that at trial the SJTA did not raise as a defense the immunity afforded to 9–1–1 employers under *N.J.S.A.* 52:17C–10. *See Wilson v. City of Jersey City,* 209 *N.J.* 558, 588, 39 A.3d 177 (2012) (involving a case where the parties did not dispute the predicate facts showing that the 9–1–1 operators were performing ministerial functions, and holding that 9–1–1 operators and their employer are immune "for any negligent mishandling of the emergency calls ... under section (d) of *N.J.S.A.* 52:17C–10"). The SJTA dispatchers apparently were not a 9–1–1 public safety answering point under *N.J.S.A.* 52:17C–7. How-

The jury returned a verdict, apportioned twenty percent negligence on the NJSP and eighty percent on the SJTA, and awarded plaintiff $8,748,311.[6] Defendants then filed a motion for a judgment notwithstanding the verdict, or in the alternative, for a remittitur or new trial. Plaintiff filed a cross-motion and sought pre-judgment interest pursuant to *Rule* 4:58-2(a)(2). The judge denied the motions, rendered a written decision, and entered the judgment.

On appeal, defendants argue that the judge erred by (1) failing to charge the jury on the palpably unreasonable standard required by *N.J.S.A.* 59:2-3(d); (2) allowing Williams to render a net opinion; (3) permitting plaintiff to submit surprise rebuttal evidence regarding mutual aid; and (4) denying their motion for a remittitur. On her cross-appeal, plaintiff contends that the judge erred by denying her motion for pre-judgment interest.

## II.

We begin by addressing defendants' argument that the judge issued a flawed jury charge. They maintain that the decision to charge ordinary negligence or a palpably unreasonable standard requires that the jury first resolve the predicate factual dispute that involved whether defendants had the discretion, pursuant to *N.J.S.A.* 59:2-3(d), to determine "how to utilize or apply their existing resources." They contend that the judge "usurp[ed] the jury's function in deciding whether the [nature of the predicate] acts [by defendants] were ministerial or discretionary." Defendants assert that the failure to resolve these predicate facts correctly deprived the jury of applying the appropriate standard

---

ever, we need not address whether the SJTA is entitled to immunity pursuant to *N.J.S.A.* 52:17C–10(d) because the parties did not raise this issue.

[6] The verdict consisted of $6,150,330.50 for pain and suffering, $2,247,980.50 for future medical expenses, and $350,000 for past and future lost wages. The judge added, pursuant to the offer of judgment rule, *R.* 4:58–3, $168,660 in counsel fees and $85,594.80 in costs. The judge then entered final judgment in plaintiff's favor in the amount of $9,002,565.80.

of care and caused ambiguity in the soundness of the verdict because it is not known whether the jury found defendants negligent for ministerial or discretionary conduct.

### A.

The standard of review for jury charges is well-established. "It is axiomatic that clear and correct jury charges are essential to a fair trial...." *Das v. Thani*, 171 *N.J.* 518, 527, 795 *A.*2d 876 (2002). Courts should correctly explain the controlling law in clear and understandable language. *Carmona v. Resorts Int'l Hotel, Inc.*, 189 *N.J.* 354, 374, 915 *A.*2d 518 (2007); *Velazquez v. Portadin*, 163 *N.J.* 677, 688, 751 *A.*2d 102 (2000).

Incorrect jury instructions "are poor candidates for rehabilitation as harmless," and generally are presumed to constitute reversible error. *Das, supra*, 171 *N.J.* at 527, 795 *A.*2d 876 (internal quotation marks omitted). In making that assessment, we must consider the jury charge as a whole. *Mogull v. CB Commercial Real Estate Grp., Inc.*, 162 *N.J.* 449, 464, 744 *A.*2d 1186, *certif. denied*, 165 *N.J.* 607, 762 *A.*2d 221 (2000). Having done so here, we concur with defendants that the jury instructions on liability were fundamentally deficient.

### B.

 Under certain circumstances, public entities are entitled to immunity pursuant to the Act. The New Jersey Legislature declared that "public entities shall only be liable for their negligence within the limitations of [the Act]." *N.J.S.A.* 59:1–2. By establishing this public policy, the Legislature recognized that "government should not have the duty to do everything that might be done." *Ibid.* Immunity, therefore, is the general rule under the Act, and liability is the exception. *Coyne v. Dep't of Transp.*, 182 *N.J.* 481, 488, 867 *A.*2d 1159 (2005). "[T]he burden is on the public entity both to plead and prove its immunity under our Act...." *Kolitch v. Lindedahl*, 100 *N.J.* 485, 497, 497 *A.*2d 183 (1985).

Pertinent to our discussion regarding whether the judge erred by charging only ordinary negligence standards is the distinction made in the Act between discretionary and ministerial functions performed by a public entity. *N.J.S.A.* 59:2–3(d) provides that

[a] public entity is not liable for the exercise of discretion when, in the face of competing demands, it determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel[,] unless a court concludes that the determination of the public entity was palpably unreasonable. Nothing in this section shall exonerate a public entity for negligence arising out of acts or omissions of its employees in carrying out their ministerial functions.

We stated in *Del Tufo v. Township of Old Bridge,* 278 *N.J.Super.* 312, 324–25, 650 *A.*2d 1044 (App.Div.1995), *aff'd on other grounds,* 147 *N.J.* 90, 685 *A.*2d 1267 (1996), that

[f]or this qualified immunity to apply—qualified because it may be overcome by a finding that the employee's determination was "palpably unreasonable"—there are two prerequisites. First[,] the challenged conduct must constitute the "exercise of discretion." Secondly, the conduct must be a determination whether and how to utilize resources "in the face of competing demands."

■ "[F]or a public entity to have acted or failed to act in a manner that is palpably unreasonable, 'it must be manifest and obvious that no prudent person would approve of its course of action or inaction.'" *Kolitch, supra,* 100 *N.J.* at 493, 497 *A.*2d 183 (quoting *Polyard v. Terry,* 148 *N.J.Super.* 202, 216, 372 *A.*2d 378 (Law Div.1977), *rev'd on other grounds,* 160 *N.J.Super.* 497, 390 *A.*2d 653 (App.Div.1978), *aff'd o.b.,* 79 *N.J.* 547, 401 *A.*2d 532 (1979), *overruled in part on other grounds, Cartel Capital Corp. v. Fireco of N.J.,* 81 *N.J.* 548, 410 *A.*2d 674 (1980)). Put another way, "the term implies behavior that is patently unacceptable under any given circumstance." *Ibid.*

An act is "ministerial" if it is " 'one which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his [or her] own judgment upon the propriety of the act being done.' " *Morey v. Palmer,* 232 *N.J.Super.* 144, 151, 556 *A.*2d 811 (App.Div. 1989) (quoting *Black's Law Dictionary,* 1148 (4th ed.1968)).

■ Thus, immunity under the Act exists for discretionary activities unless a public entity's actions were palpably unreasonable. And ordinary negligence principles apply for a public entity's performance of ministerial functions. "'Palpably unreasonable' means more than ordinary negligence, and imposes a steep burden on a plaintiff." *Coyne, supra,* 182 *N.J.* at 493, 867 *A.*2d 1159.

## C.

■ We now turn to defendants' contention that the judge "usurp[ed] the jury's function in deciding whether the [nature of the predicate] acts in question were ministerial or discretionary."

As noted, the parties aggressively disputed whether defendants lacked discretion to accept mutual aid, split up the troopers, and timely dispatch troopers and tow trucks. For example, defendants introduced evidence that showed they exercised discretion whether to accept mutual aid. Egg Harbor PD called the SJTA and offered assistance to the troopers. Sergeant Kramer asked the dispatch operators what they usually do when a local police department offers to assist them, and Dispatcher Buccilli indicated that they usually first accept police assistance from the nearby airport. Sergeant Kramer then declined the mutual aid from Egg Harbor PD and called for police assistance from the airport. In doing so, he allegedly followed the SJTA unwritten procedure. The sergeant also requested that additional troopers from the next shift arrive early to assist the troopers on duty. Thus, there is evidence from which the jury could reasonably find that defendants "exercis[ed] personal deliberations and judgment," and he examined "the facts, reach[ed] reasoned conclusions, and act[ed] on [those facts] in a way not specifically directed." *Kolitch, supra,* 100 *N.J.* at 495, 497 *A.*2d 183. Of course, if the jury were to find as such, then the jury would have to go on to decide whether the declination of mutual aid amounted to a palpably unreasonable determination.

Likewise, defendants introduced evidence that they exercised discretion as to whether to split up the troopers. Sergeant Kramer testified that the unwritten policy of the NJSP is not to split up troopers after midnight when it snows. He testified that

Q: You wait until ... the situation really warrant[s splitting up troopers]. [Y]ou need a lot of extra hands; so that would be the time when you would separate [the troopers]?

A: Yes.

Q: And in fact, that's what happened that night, correct?

A: Yes.

Q: It was—once the accidents began happening and you realized that, "hey, there's more accidents than we can handle with two cars," you called in one of the troopers to separate them, correct?

A: Yes.

Plaintiff's expert Williams offered conflicting proof regarding SOP 41. Williams opined that defendants' SOP 41 required them to accept mutual aid and split up the troopers. Williams indicated that SOP 41, and other industry standards, mandated that defendants "seek assistance from other [police] departments." Thus, he disagreed with Kramer's testimony that defendants had the discretion to decline mutual aid.

Williams also testified that "it is the duty and responsibility to immediately get the personnel out with red lights, whatever material markings, signs that are available to the [SJTA] to redirect traffic and for the [NJSP] to, in effect, close down the road." He concluded that forty-one minutes is "totally inadequate and ... not in a timely manner, not dispatched in the manner that the rules and regulations call for."

Yet, despite the conflicting evidence regarding whether defendants had the discretion to determine, in the face of competing demands, how to apply their existing resources, the judge decided the issue instead of submitting it to the jury. We have previously addressed in dicta the need to submit to a jury disputed predicate facts regarding the discretionary or ministerial nature of a public entity's actions. In *Del Tufo, supra,* 278 *N.J.Super.* at 315–16, 650 *A.2d 1044,* a man died while he was in police custody. His

executor argued that the death occurred because the police alleg-
edly "failed to summon emergency medical assistance for [the
decedent] promptly after they arrested him." *Id.* at 315, 650 *A.*2d
1044. Rather, the police waited to call the first aid squad until
approximately thirty minutes later. *Id.* at 315–16, 650 *A.*2d 1044.
In concluding that *N.J.S.A.* 59:3–2(d) was inapplicable, we stated
that

> *if the critical question were whether the failure of the police to provide immediate*
> *medical assistance was the result of a discretionary decision, the trial court would*
> *have had to submit that issue to the jury.* But determination of that question was
> immaterial because there is no evidence in the trial record that the police
> consciously considered whether to summon emergency medical assistance and
> decided not to because they were weighing competing demands on public re-
> sources.
>
> [*Id.* at 326, 650 *A.*2d 1044 (emphasis added).]

Here, by contrast, the record contains evidence that defendants
"consciously considered" the action they took that night in light of
conflicting or competing demands where resources were obviously
pushed to the limit. This is especially so with regard to whether
to split up the troopers and accept mutual aid. Resolution of
whether defendants' decision was, in fact, discretionary or ministe-
rial requires submission to the jury.

Other than the intimation in *Del Tufo, supra,* our research has
not disclosed any cases in New Jersey directly on point. We have
located cases from other jurisdictions, however, that provide per-
suasive support that disputed predicate facts regarding the discre-
tionary or ministerial nature of a public entity's actions must be
submitted to the jury. *See Glass v. Gates,* 311 *Ga.App.* 563, 716
*S.E.*2d 611, 622 (2011) (indicating that, in the context of determin-
ing whether a corrections officer performed a ministerial or dis-
cretionary act, the disputed predicate facts of whether the County
had an unwritten departmental policy imposing a ministerial duty
required submission to a jury), *aff'd on other grounds,* 291 *Ga.*
350, 729 *S.E.*2d 361 (2012); *Thompson v. City of Minneapolis,* 707
*N.W.*2d 669, 675 (Minn.2006) (stating that "in the context of
qualified immunity, a case should be submitted to the jury when
the facts giving rise to the applicability of qualified immunity were

disputed" (internal quotation marks omitted)). In *Thompson, supra,* 707 *N.W.*2d at 675 (quoting *Ludwig v. Anderson,* 54 *F.*3d 465, 474 (8th Cir.), *reh'g denied en banc,* (1995)), the court stated that

> where ... "there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." The evidence in this case presents material issues of fact on which the issue of qualified immunity turns and "presents a sufficient disagreement to require submission to a jury."

Thus, when the parties dispute the predicate facts necessary for deciding whether the conduct of a public entity was discretionary or ministerial conduct, as in this case, that dispute requires submission to the jury.

## D.

We also agree with defendants that the failure to distinguish, in the final charge and on the verdict sheet, the predicate facts tending to show either ministerial or discretionary acts created uncertainty regarding whether the jury found defendants negligent for ministerial or discretionary conduct. The parties sharply contested whether SOP 41, or other industry standards, mandated action or allowed discretion. The verdict sheet and final instructions do not reflect that the jury resolved that factual dispute.

If, in the new liability trial, the jury determines that defendants had the discretion to determine, in the face of competing demands, whether and how to apply their existing resources, the jury would then be required to find whether that determination was palpably unreasonable. "Whether the conduct of the public entity or entities was 'palpably unreasonable' under all of the circumstances is a question for jury determination." *Paternoster v. N.J. Dep't of Transp.,* 190 *N.J.Super.* 11, 20, 461 *A.*2d 759 (App.Div.), *certif. denied,* 96 *N.J.* 258, 475 *A.*2d 564 (1983). If, on the other hand, the jury determines that defendants had no discretion and were obligated, for example, to accept mutual aid and split up the troopers, then the jury would evaluate defendants' liability exposure using ordinary negligence principles. The final

jury charge and verdict sheet must be tailored accordingly at the new trial.

We anticipate that the jury verdict sheet will contain questions for each disputed predicate fact where the record shows that defendants consciously considered whether to exercise discretion on how to utilize their resources. If the jury finds that the decision to decline mutual aid, for example, was discretionary, then they must determine, in accordance with the final charge, whether defendants' determination was palpably unreasonable. On the other hand, if they find that it was a ministerial act, then they must determine whether defendants acted negligently. The same applies to the other disputed predicate facts if the record shows that defendants consciously considered how to allocate their resources. By tailoring the verdict sheet to fit the facts at the new liability trial, any uncertainty regarding whether the jury found defendants negligent for discretionary decisions will be removed.

### III.

We now turn to defendants' net opinion argument. Williams opined that "the SJTA and Sergeant Kramer were required to accept and seek out mutual aid." Defendants assert that "the sole purported basis for his opinion was SOP 41." They maintain that Williams rendered a net opinion because SOP 41 does not use the words "mutual aid," nor is that concept addressed or implied. We apply a "deferential approach to a trial court's decision to admit expert testimony, reviewing it against an abuse of discretion standard." *Pomerantz Paper Corp. v. New Cmty. Corp.*, 207 *N.J.* 344, 371, 25 *A.*3d 221 (2011). Against that standard, we see no abuse.

At the outset, we note it was improper for Williams to opine, without the use of a limiting instruction, that defendants were "duty bound" or required by SOP 41 to accept mutual aid. The predicate disputed fact was whether defendants had the discretion to decline mutual aid from Egg Harbor PD, and, if so, whether

defendants did so by allocating existing resources in the face of competing demands. A limiting instruction would be warranted at a new trial because "public entities shall only be liable for their negligence within the limitations of [the Act]," *N.J.S.A.* 59:1–2, rather than by opinion testimony of an expert. *See, e.g., Townsend v. Pierre*, 429 *N.J.Super.* 522, 525, 60 *A.*3d 800 (App.Div. 2013) (approving the use of a limiting instruction to assist the jury's consideration of an expert's opinion).

Nevertheless, we conclude that the omission of any discussion of mutual aid in SOP 41 does not, in and of itself, render Williams' opinion a net opinion. A net opinion is "an expert's bare opinion that has no support in factual evidence or similar data." *Pomerantz, supra*, 207 *N.J.* at 372, 25 *A.*3d 221. "[A] court must ensure that the proffered expert does not offer a mere net opinion." *Ibid.* In general, an expert should provide the "why and wherefore" supporting his or her analysis. *Ibid.* Here, Williams did just that.

To be sure, Williams testified that SOP 41 required defendants to accept the mutual aid, thereby implying that they were without discretion to decline it. However, he did not limit the basis of his opinion solely to SOP 41. He testified that

Q: [B]ased upon everything that you have reviewed [7] in your [forty-]plus years of experience, your education, your training, do you have a concluding opinion within a reasonable degree of law enforcement policy, practice, and procedures certainty[,] regarding [plaintiff's] accident?

. . . .

A: [ (Quoting from his report) Plaintiff's accident] would have been avoided by the application of standard and accepted dispatch procedures.

He referred, therefore, to "standard and accepted dispatch procedures," not just SOP 41. In addressing applicable unwritten industry standards regarding mutual aid, he testified that

---

[7] In rendering his report, Williams relied on, among other things, "extensive documentation," NJSP videotapes, CAD reports, the 9–1–1 calls, deposition testimony, SOP 41, and the operation manuals of emergency services patrol vehicles.

Q: If it's not in writing ... how [would] the troopers know how to [evaluate whether to accept mutual aid]? ...

A: In law enforcement, there are a number of things that are *accepted policy and procedure*, things that police officers automatically do in coming to the aid of other police officers, and a lot of times these things are not written down.

Q: If there is no written operating procedure for calling in mutual aid, how do the operators know that it should be done ... ?

A: In many instances, the state police are called upon to render mutual aid to police departments. Those requests are *usually* made through dispatch services of the police department to whatever state police station that's in the area, and that same type of a request is likewise made by troopers when they need assistance from police departments....

[ (Emphasis added).]

Plaintiff had data showing that Egg Harbor PD rendered mutual aid to the NJSP previously, and Williams testified that "[i]t's accepted procedure and policy" to accept mutual aid with other police departments, such as Atlantic City. Moreover, he testified that mutual aid "is a common practice for police agencies" to "call upon each other out of necessity in emergency situations." Thus, Williams based his opinion that the NJSP customarily accept mutual aid from local police departments on his interpretation of SOP 41, accepted police industry standards and procedures, and the actual practice of accepting mutual aid employed by the NJSP. Therefore, admission of his testimony was not error.

## IV.

Defendants contend that the judge erred in denying their motion for remittitur. They argue that the verdict is "wide of the mark" compared to "what other plaintiffs have recovered in similar cases." We are not persuaded by these contentions.

### A.

 Justice Hoens explained in *Ming Yu He v. Miller*, 207 *N.J.* 230, 248, 24 *A.*3d 251 (2011), that

[t]he authority to apply remittitur springs from the court's power to grant a new trial. *See R.* 4:49–1. That power may be exercised when "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it *clearly and convincingly appears that there was a miscarriage of justice under the*

law." *Ibid.; see also Carrino v. Novotny,* 78 *N.J.* 355, 360–61, 396 *A.*2d 561 (1979) (describing evolution of [the] standard).

[ (Emphasis added).]

Remittitur is an alternative to ordering a new trial, *ibid.,* and the power to order a new trial is "limited," *id.* at 249, 24 *A.*3d 251 (quoting *Carey v. Lovett,* 132 *N.J.* 44, 46, 622 *A.*2d 1279 (1993)). Here, defendants' argument on appeal is not that the judge failed to order a new trial on damages; rather, they contend that the judge erred by denying their motion for remittitur.[8] Thus, we focus on whether the "jury's award ... is 'so disproportionate to the injury and resulting disability as to shock the conscience and [convince the court] that to sustain the award would be manifestly unjust.' " *Ibid.* (quoting *Baxter v. Fairmont Food Co.,* 74 *N.J.* 588, 604, 379 *A.*2d 225 (1977)).

Plaintiff was thirty-two years old when the accident occurred, and she had three children, ages one, seven, and ten. Her right leg below the knee was severed at the scene of the accident, and she then required amputation above the knee. Thereafter, she underwent between five and six operations for skin grafting, irrigation, and debridement, and reconstruction of her pelvis necessitating the insertion of a metal plate and screws. She sustained an ankle fracture requiring a brace and physical therapy, shoulder tendonitis, and pain and bone bruising on her left knee. She required outpatient surgery to remove three shards of glass from her forehead, which left her with visible scarring on her forehead. She developed carpal tunnel syndrome from using a walker and crutches in the sixteen to seventeen months after the accident. She suffered from excessive bone growth causing pain at the amputation site when she wore a prosthesis. Her pain and suffering directly affected her attempts to return to work as a casino dealer.

---

[8] The unpublished opinion that defendants' counsel cited to us following oral argument is not on point, as that case concerned flawed jury instructions on both liability and damages, and thus does not affect our reasoning.

After the accident, plaintiff became pregnant and returned to her orthopedic surgeon, where she complained of increased pelvic pain. X-rays showed additional bone growth at the amputation site necessitating more surgery after she delivered the baby. Plaintiff then underwent carpal tunnel surgery on her left hand after the pregnancy, and her doctor indicated that she would need the same procedure on her right hand.

Valerie Parisi, plaintiff's certified life-care planner, testified that plaintiff's rehabilitative care needs would cost $2,632,944.89 if she lived at home up to age sixty-five, and an additional $2,695,222.49 if she received assisted living thereafter. Her vocational and economic expert, Robert Wolf, explained that plaintiff worked full-time as a casino dealer earning just over $59,000 per year, which he annualized to $63,684. She did not return to work until approximately one year after the accident, and then she worked on a part-time schedule. Wolf calculated that she suffered wage losses of $310,949 plus a present value of $107,149 for the value of her domestic household services, for a total economic loss of $418,098.

Plaintiff, her husband, and older brother and sister testified regarding her life activities before and after the accident. Before the accident, she was able to, among other things, play with her daughter, kick the ball around with her nephew, ride a bike, dance, paint, cook, do laundry, and work full-time. After the accident, she was unable to do any of these things.

The judge concluded that the $8,748,311 verdict was proper and not based on bias, prejudice, or sympathy. We give deference to the judge's "feel of the case," *Ming Yu He, supra,* 207 *N.J.* at 255, 24 *A.*3d 251 " 'with regard to the assessment of intangibles,' " *ibid.* (quoting *Jastram v. Kruse,* 197 *N.J.* 216, 230, 962 *A.*2d 503 (2008)). The judge explained that the jury reduced Wolf's number of $418,098, for plaintiff's total economic damages, to $350,000. The jury also rejected Parisi's projection, for expenses for future medical treatment, to $2,247,980.50. The judge stated that the $6,150,330.50 awarded for pain, suffering, disabili-

ty, impairment, and loss of enjoyment of life "was delineated down to cents on the dollar and reflected the [j]ury's opinion based on testimony and evidence throughout the trial. Therefore, this Court finds that the jury verdict is fair compensation."

Defendants contend that other plaintiffs have recovered less "in similar cases." However, the cases cited in defendants' brief involved settlements, not jury verdicts. The *Chirallo* matter, which resulted in a $1,350,000 settlement, did not involve an amputated leg but rather broken bones and one year of painful medical treatment to avoid amputation. The *Helman* settlement involved public entity immunity issues that were denied in motions just prior to the settlement and involved an amputee in his fifties, who settled at $1,200,000. The *Reyes–Montenes* settlement for $1,425,000 does not indicate the plaintiff's age, and was complicated by issues of whether the general contractor or the employer-subcontractor had liability for the worker's on-the-job injury. The *Tornquist* settlement is most comparable to the present matter, involving a thirty-year-old amputee who settled at $5,550,000. Our Court has cautioned that "a pre-trial settlement offer is entirely irrelevant in a remittitur case in which the fundamental inquiry is not what anyone thought the case was worth beforehand, but whether the jury could have reached the verdict on the evidence actually before it." *Jastram, supra,* 197 *N.J.* at 233, 962 *A.*2d 503.

Here, the "verdict may only be set aside if it is wide of the mark and pervaded by a sense of wrongness," and the verdict "is [not] so disproportionate to the injury and resulting disability as to shock the conscience and [convince the court] that to sustain the award would be manifestly unjust." *Ming Yu He, supra,* 207 *N.J.* at 249 (internal quotation marks omitted). Against these standards, we see no error.

## B.

█ Finally, we agree with plaintiff that we should preserve the damage award even if we conclude that a new trial on liability

is warranted.[9] The disputed predicate facts regarding the discretionary or ministerial nature of defendants' actions are separate and distinct from plaintiff's claim for damages.

The "general rule [is] that issues in negligence cases should be retried together unless the issue unaffected by error is entirely distinct and separable from the other issues." *Ahn v. Kim*, 145 *N.J.* 423, 434, 678 *A.*2d 1073 (1996); *accord Ogborne v. Mercer Cemetery Corp.*, 197 *N.J.* 448, 461, 963 *A.*2d 828 (2009) (holding that issues of proximate causation and comparative negligence were "intertwined" with issue of duty, thereby requiring retrial on all three issues); *Conklin v. Hannoch Weisman*, 145 *N.J.* 395, 410, 678 *A.*2d 1060 (1996) (ordering retrial of both proximate causation and negligence because the issues were not "distinct and separable"); *Martin v. Prime Hospitality Corp.*, 345 *N.J.Super.* 278, 293, 785 *A.*2d 16 (App.Div.2001) (stating that the failure to apportion liability did not affect the damage award); *Truchan v. Sayreville Bar & Rest., Inc.*, 323 *N.J.Super.* 40, 53, 731 *A.*2d 1218 (App.Div.1999) (indicating that "the damages issue need not be relitigated [because] we conclude that the liability issues and the damages issues were fairly separable").

This is not a situation where the judge issued a flawed final jury charge on proximate causation, thereby prompting a request that a re-trial on all issues occur, and then found that the proximate causation and negligence issues were not "distinct and separable." Nor is this a matter where the jury considered the severity of defendants' conduct in the context of a claim for punitive damages. In fact, no claim for punitive damages is permitted against public entities. *N.J.S.A.* 59:9–2(c). Rather, the error in the charge warranting a new liability trial pertains to the discretionary or ministerial nature of defendants' conduct. A re-trial on liability, then, would relate to whether defendants had the discretion to determine, in the face of competing demands, whether and how to

---

[9] Plaintiff's recovery of compensation is, of course, dependent on the outcome of the new trial on liability.

apply their existing resources. The issues in such a trial are separate and distinct from issues pertaining to compensation for pain and suffering, economic loss, and for future medical treatment.

## V.

 Two additional arguments by defendants warrant only brief mention here. First, defendants contend that the trial court erred in permitting plaintiff to submit surprise rebuttal evidence regarding mutual aid. Although we need not reach this issue because we are reversing the liability judgment, we do so for completeness. McKaig testified on direct examination that defendants never called local police departments as first responders. Plaintiff produced Frederick J. Wood as her rebuttal witness, who testified that the Pleasantville Police Department provided mutual aid to the NJSP. Defendants then produced Jeffrey Anderson, who testified about the lack of written standards regarding mutual aid. Defendant therefore opened the door to the rebuttal evidence and was not prejudiced by it.

 Second, defendants argued for the first time that the verdict of no cause of action as to Raddi was against the weight of the evidence. Ordinarily, we will decline to consider questions or issues not properly presented to the trial court when an opportunity for such a presentation is available, " 'unless the questions so raised on appeal go to the jurisdiction of the trial court or concern matters of great public interest.' " *Nieder v. Royal Indem. Ins. Co.*, 62 *N.J.* 229, 234, 300 *A.*2d 142 (1973) (quoting *Reynolds Offset Co., Inc. v. Summer*, 58 *N.J.Super.* 542, 548, 156 *A.*2d 737 (App. Div.1959), *certif. denied*, 31 *N.J.* 554, 158 *A.*2d 453 (1960)). Neither exception applies here, but because we may dispose of the arguments summarily, and in the interest of justice, we address defendants' contention. There is ample evidence that Raddi nonnegligently skidded on black ice. *See Universal Underwriters Grp. v. Heibel*, 386 *N.J.Super.* 307, 322, 901 *A.*2d 398 (App.Div.

2006) (stating that skidding "is not in itself sufficient to justify an inference of negligence").

## VI.

On her cross-appeal, plaintiff contends that the judge erred by failing to award her pre-judgment interest pursuant to *Rule* 4:58–2(a)(2). She argues that the judge violated the separation of powers doctrine by erroneously concluding that the Act prohibited such interest.

The offer of judgment rule allows a party to take a judgment against it for a sum certain. *R.* 4:58–3. "The fundamental purpose of the rule is to induce settlement by discouraging the rejection of reasonable offers of compromise." *Best v. C & M Door Controls, Inc.*, 200 *N.J.* 348, 356, 981 *A.*2d 1267 (2009). The consequences of rejecting an offer of judgment are expressed in *Rule* 4:58–2, which states in pertinent part that

> (a) If the offer of a claimant is not accepted and the claimant obtains a money judgment, in an amount that is 120% of the offer or more, excluding allowable prejudgment interest and counsel fees, the claimant shall be allowed, in addition to costs of suit: ... (2) prejudgment interest of eight percent on the amount of any money recovery from the date of the offer or the date of completion of discovery, whichever is later, but only to the extent that such prejudgment interest exceeds the interest prescribed by [*Rule*] 4:42–11(b), which also shall be allowable....

Where a settlement offer is more favorable to the losing party than the ultimate judgment, the goal of the rule is achieved by imposing fees and costs. *Ibid.*

*N.J.S.A.* 59:9–2(a), on the other hand, states that "[n]o interest shall accrue prior to the entry of judgment against a public entity or public employee." Thus, there is tension between the rule and statute.

The drafters of the New Jersey Constitution of 1947 expressly stated that

> [t]he powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
>
> [*N.J. Const.* art. III, ¶ 1.]

"That bedrock principle is one of independence and interdependence among the coordinate branches of our government." *In re Advisory Comm. on Prof'l Ethics Opinion 705,* 192 *N.J.* 46, 54, 926 *A.*2d 839 (2007). The doctrine " 'contemplates that each branch of government will exercise its own powers without transgressing upon the powers rightfully belonging to a cognate branch.' " *Id.* at 55, 926 *A.*2d 839 (quoting *Knight v. Margate,* 86 *N.J.* 374, 388, 431 *A.*2d 833 (1981)).

Nevertheless, "our Constitution encourages cooperation among the branches." *Ibid.* For example, the Court has shared jurisdiction with the Legislature regarding the Court's express authority to "have jurisdiction over the admission to the practice of law and discipline of persons admitted," *ibid.* (citing *N.J. Const.* art. VI, § 2, ¶ 3), and "upheld narrowly-circumscribed legislation that touches on attorney discipline," *ibid.* (citing *McKeown–Brand v. Trump Castle Hotel & Casino,* 132 *N.J.* 546, 554, 556, 626 *A.*2d 425 (1993)).

 Another example of cooperation among the branches is found in *Busik v. Levine,* 63 *N.J.* 351, 373 n. 10, 307 *A.*2d 571, *appeal dismissed sub nom. Levine v. Busick,* 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973) (involving the validity of *Rule* 4:42–11(b), which authoriz[es] prejudgment interest in tort actions), where the Court explained the rule's interaction with the Act:

> After the adoption of the prejudgment interest rule ..., the Legislature enacted the [Act,] which provides in *N.J.S.A.* 59:9–2a that "[n]o interest shall accrue prior to the entry of judgment against a public entity or public employee." We have approved an amendment to our rule of Court which will except that situation.

Likewise, in *Potente v. County of Hudson,* 187 *N.J.* 103, 114, 900 *A.*2d 787 (2006) (internal quotation marks omitted), the Court rejected as "simply wrong" the analysis of some prior cases that "prejudgment interest will not be awarded against a public entity except where provided by statute." The Court explained that

> [w]hat the [pre-judgment interest] rule actually says is that pre-judgment interest shall be awarded against all defendants unless it is prohibited by applicable law. For example, the [Act] states, in relevant part, that "[n]o interest shall accrue prior

to the entry of judgment against a public entity or public employee." *N.J.S.A.* 59:9–2(a). Therefore, [the Act's] claims are not subject to *Rule* 4:42–11(b). *See Dorn v. Transp. of N.J.*, 200 *N.J.Super.* 159, 164, 491 *A.*2d 1 (App.Div. [1984]); *Maynard* [*v. Mine Hill Twp.*], 244 *N.J.Super.*[298], 303 [582 *A.*2d 315 (App.Div. 1990)].

[*Ibid.*]

We agree with defendants' contention in their brief that permitting pre-judgment interest against a public entity pursuant to the offer of judgment rule would "render meaningless the [Court's] amendment of [*Rule* ] 4:42–11[, which excludes] public entities in deference to the [Act, because] all a litigant would have to do to bypass [the bar against pre-judgment interest] would be to make an offer of judgment." Here, we do our best to harmonize our constitutional powers with the will of the Legislature. *In re Advisory Comm. on Prof'l Ethics Opinion 705, supra,* 192 *N.J.* at 56, 926 *A.*2d 839.

We have carefully considered the remaining contentions that the parties have raised and have determined that those arguments lack sufficient merit to address in this written opinion. *R.* 2:11–3(e)(1)(E).

We reverse the judgment on liability, remand for a new trial, and affirm in all other aspects.