Kristen THOMPSON, Respondent,

v.

CITY OF MINNEAPOLIS,
et al., Appellants,

Michael Litz, Respondent.

No. A04–1050.

Supreme Court of Minnesota.

Jan. 10, 2006.

OPINION

BLATZ, Chief Justice.

A sport utility vehicle (SUV) driven by respondent Michael Litz was being followed by two Minneapolis Police Officers in a detox van when the SUV hit and injured pedestrian respondent Kristen Thompson as she was crossing a street in downtown Minneapolis. Thompson filed a negligence claim against Litz, the two police officers who were following Litz, and the City of Minneapolis. Thompson's claim alleged that the officers' careless and negligent operation of the van was the direct and proximate cause of Thompson's injuries. The city and the officers moved for summary judgment based on the defense of official immunity for the officers and vicarious official immunity for the city. The district court granted the motion, holding that the officers' decision to pursue Litz was discretionary and therefore was entitled to official immunity. The court of appeals reversed and remanded, holding that once the discretionary decision to pursue had been made, the officers' failure to perform the ministerial duties of turning on the detox van's emergency lights and sirens made the defense of official immunity inapplicable. We affirm the denial of summary judgment but remand the case for further fact-finding to determine if the officers initiated a "vehicular pursuit" as defined by the Minneapolis Vehicle Operation Policy ("Pursuit Policy") section 7–404, and if so, whether the officers employed the van's emergency lights and siren as required by Pursuit Policy section 7-405.

At approximately 1:30 p.m. on Thursday, November 29, 2001, Minneapolis Police Officer Thomas Schmid was driving a police detox van with his partner Police Officer Gordon Blackey in the passenger seat. While heading southbound on Nicollet Avenue, Schmid stopped the van for a red

light at Fourth Street. Shortly after the light turned green, the officers observed an SUV driven by Litz go through a red light at Nicollet Avenue while heading eastbound on Fourth Street. According to Litz, while stopped partway into that intersection, he looked to his left and saw the detox van flash its emergency lights. He "got scared and took off." The officers then followed the SUV through downtown Minneapolis. Seven blocks later, Litz drove through a red light and the SUV struck pedestrian Thompson as she was crossing Fourth Avenue at Seventh Street. Litz drove for an additional block after the accident, turned the corner, and then ran from the SUV. Officer Blackey apprehended Litz a short time later. Litz was ultimately convicted of a hit and run accident involving Thompson.

On appeal, Thompson claims, *inter alia,* that the officers' failure to continuously operate their van's emergency lights and siren while pursuing Litz was negligent because the officers had a duty to warn her of the pursuit. The city and officers assert that they never initiated a vehicular pursuit as defined by the Pursuit Policy section 7–404, which reads:

> *VEHICULAR PURSUIT*—A vehicular pursuit occurs whenever an officer pursues a driver of a vehicle who has been given a signal to stop by the activation of red lights and siren, and the suspect or violator fails to comply and attempts to elude the officer by taking evasive actions.

They further argue that, because they never initiated a pursuit, they are entitled to official immunity from the negligence action because they did not have a ministerial duty to continuously operate their emergency lights and siren as required by Pursuit Policy section 7–405, set forth *infra* in footnote 3. While the parties vigorously dispute the facts giving rise to the

claims before us, we focus on the facts critical to the determination of whether the officers are entitled to official immunity: (1) whether the officers initiated a vehicular pursuit, and (2) whether and when the officers activated the detox van's emergency lights and siren.

Beyond an agreement that the police van followed Litz through downtown and that Litz's vehicle struck Thompson, the record provides a confused and contradictory account of what occurred in the few minutes before the collision. At least 19 different witnesses provided depositions or statements recounting their memories of the incident, with most witnesses seeing only a portion of what transpired in the final block before the collision.

Regarding whether a "vehicular pursuit" was initiated, Litz testified that he was "chased" through downtown. In contrast, the officers testified that although they did attempt to make a "traffic stop," they never initiated or engaged in a "vehicular pursuit" of Litz as defined by the Pursuit Policy. Litz testified that the police van went through some of the same red lights that he did while Officer Schmid testified that he drove through two red lights—on Fourth Street—only after stopping and activating the van's emergency lights and siren. Although both Litz and the officers agreed that Litz was speeding during the incident, the officers contend that they never exceeded the speed limit while Litz implies that they were going even faster than he was, testifying that the officers were catching up to him at the end of seven blocks. In contrast, the officers testified that the distance between the detox van and Litz's SUV increased as they attempted to follow him. The other eyewitnesses' testimony on this point is similarly varied, as witnesses indicate that the police van arrived at the scene of the accident

between five seconds and "45 to 50 seconds" after the accident.

In addition to whether the officers initiated a vehicular pursuit of Litz, the parties also dispute whether and when the officers activated their emergency lights and siren. The officers both testified that they each [1] first activated the van's emergency lights "mid-block" of Fourth Street between Nicollet and Marquette Avenues. The officers also testified that they each turned the emergency lights off after they had cleared the Fourth Street and Second Avenue intersection approximately two blocks later. Litz testified that the van's emergency lights were activated while he was stopped in the intersection of Fourth Street and Nicollet Avenue, one-half block earlier than where the officers testified to first turning the emergency lights on. He further testified that although he frequently looked in his rearview mirror and saw the police van close behind him throughout the entire incident, he never saw the emergency lights on again.

The testimony on the use of the siren is also conflicting. Litz testified that he never heard the van's siren. Schmid, the driver, testified that he activated the siren only for a few seconds at the intersection of Fourth Street and Marquette Avenue and then again for a few seconds at the intersection of Fourth Street and Second Avenue. Each time, he activated the siren to clear through the intersection against a red light and then deactivated the siren after clearing the intersection. Schmid testified that he did not turn the siren on again before he and Blackey came upon the scene of the accident on Fourth Avenue. In contrast, Blackey testified that he—not Schmid—activated the siren "mid-block of Fourth between Nicollet and Marquette," simultaneously with his activation of the lights. Blackey further testified that he turned the siren off after they had turned onto Second Avenue from Fourth Street. Blackey stated that he did not activate the siren again before they came upon the scene of the accident, but did not remember if Schmid activated it earlier. Confusing matters further, as noted by the district court, the sound of a siren is audible on the audiotape at all times when the officers were broadcasting, including the time when they were traveling eastbound on Sixth Street—a time when neither officer testifies to the siren being activated.

Finally, the other eyewitness testimony does little to clarify the officers' operation of their emergency lights and siren. One witness testified that as the police van approached the corner of Sixth Street and Fourth Avenue, one block before the spot where Litz collided with Thompson, the van's emergency lights and siren both were on. Other witnesses testified that the van's emergency lights and siren were not on in the final block as the van approached the scene of the collision.

Thompson filed a personal injury negligence action against Litz, the officers, and the city. With respect to the officers, the complaint alleged that the detox van "was being operated in a careless and negligent manner and in violation of the Minneapolis Police Department[']s Pursuit Policy, including but not limited to the failure to use their flashing emergency lights and siren." The officers and the city moved for summary judgment based on official and vicarious official immunity. The district court granted the motion, concluding that the officers' decision to pursue Litz was a discretionary and not a ministerial act. Additionally, the district court concluded that the officers had not committed a willful or

---

1. The officers' testimony on the activation and deactivation of the emergency lights and siren conflicts; each of them testified that he was the one to turn them on and off.

malicious wrong, and therefore official immunity relieved the officers of liability. Finally, the district court held that the city was entitled to vicarious official immunity.

The court of appeals reversed and remanded, holding that although the officers' original decision of whether to engage in pursuit was discretionary, the Pursuit Policy imposed ministerial duties on the officers in conducting a pursuit. *Thompson v. City of Minneapolis,* No. A04–1050, 2005 WL 89492, at *4–5 (Minn.App. Jan.18, 2005). In concluding that the Pursuit Policy imposed ministerial duties, the court relied on the language of section 7–405, which required that " '[o]fficers shall use their red lights and siren in a continuous manner' when engaged in vehicular pursuit," and section 7–408, which required the officers to "[t]urn off the pursuit route at the next available intersection" and notify dispatch when terminating a pursuit. *Thompson,* 2005 WL 89492, *4–5 (quoting Pursuit Policy). Holding as a matter of law that the officers had initiated a pursuit, the court of appeals held that the officers' failure to conform to the requirements set forth in sections 7–405 and 7–408 resulted in a loss of official immunity. *Thompson,* 2005 WL 89492, at *4–5. Finally, the court of appeals denied vicarious official immunity to the city because the officers did not have official immunity. *Id.* at *6.

 In reviewing an appeal from the grant or denial of official immunity on summary judgment, we must determine whether there are genuine issues of material fact and whether the lower court erred in applying the law. *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11,* 678 N.W.2d 651, 655 (Minn.2004). We consider the evidence in the light most favorable to the nonmoving party. *Gleason v. Metro. Council Transit Operations,* 582 N.W.2d 216, 217 (Minn.1998). The appli-

cation of official immunity presents a question of law reviewed de novo. *Id.* at 219. Summary judgment should be granted if the pleadings, depositions, answers to interrogatories, affidavits, and admissions on file "show that there is no genuine issue as to any material fact and that either party is entitled to judgment as a matter of law." Minn. R. Civ. P. 56.03.

 A public official is not protected by immunity in the performance of his duties when he fails to perform a ministerial act, or when his performance of a discretionary act is willful or malicious. *Anderson,* 678 N.W.2d at 660, 662. We have distinguished discretionary acts from ministerial acts by defining a discretionary act as one requiring "the exercise of individual judgment in carrying out the official's duties." *Kari v. City of Maplewood,* 582 N.W.2d 921, 923 (Minn.1998). A ministerial act, in contrast, is " 'absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.' " *Cook v. Trovatten,* 200 Minn. 221, 224, 274 N.W. 165, 167 (1937) (quoting *People v. May,* 251 Ill. 54, 95 N.E. 999, 1000 (1911)).

 In order to determine whether the conflicting accounts of the officers' conduct raise a genuine issue of material fact regarding the officers' official immunity, we first must determine " 'the precise governmental conduct at issue.' " *Gleason,* 582 N.W.2d at 219 (quoting *Watson v. Metro. Transit Comm'n,* 553 N.W.2d 406, 415 (Minn.1996)). In the instant case, the district court granted official immunity to the officers on summary judgment because it focused on the officers' "decision to pursue" Litz and determined that it was a discretionary act. The court of appeals reversed, focusing instead on the manner in which the officers carried out their duties in following Litz. *Thompson,* 2005 WL 89492, at *4–5. The court of appeals

held that although the officers' decision to pursue was discretionary, the officers' failure to continuously operate their vehicle's emergency lights and siren while pursuing Litz was a breach of a ministerial duty mandated by the Pursuit Policy.[2] *Id.*

In our recent opinion in *Anderson,* a high school woodworking teacher was sued for negligence after a portion of a student's finger was severed while the student used a table saw to make rip cuts of thin strips of wood. 678 N.W.2d at 654. We addressed the issue of whether the school district's unwritten safety protocol regarding the use of a table saw's blade guard imposed a ministerial duty upon a teacher in the conduct of that teacher's classroom instruction. *Id.* at 659. In holding that the protocol did impose a ministerial duty, we made clear that the challenged conduct of the teacher was not the discretionary decision "to teach woodworking, to use power equipment in the course, to allow [the student] to use the table saw, or even to leave [the student]

unsupervised to make the remaining rip cuts on his own." *Id.* at 656. Rather, the specific conduct challenged was the ministerial decision of whether to instruct the student to make rip cuts with the blade guard disengaged as clearly dictated by an established protocol. *Id.* at 656–57.

In the instant case, we agree with the court of appeals that the precise conduct at issue is the officers' conduct in following Litz after they initially observed him committing a traffic violation. On this record, however, we cannot determine whether the officers initiated a "vehicular pursuit" as defined by the Pursuit Policy. In particular, it is unclear if their admitted attempt to make a "traffic stop" became a "vehicular pursuit" under the Pursuit Policy, and if it did, at what point during the incident it became one.

▆▆▆ If the officers initiated a vehicular pursuit, the language of Pursuit Policy section 7–405 clearly imposed a ministerial duty upon them. Section 7–405 states:

2. Volume Seven of the Minneapolis Police Department Operations Section is entitled "Field Operations." Chapter 7–400 is entitled "Vehicle Operation." Pertinent parts of Chapter 7–400 read as follows:

7–404 *VEHICULAR PURSUIT DEFINITIONS*
*VEHICULAR PURSUIT*—A vehicular pursuit occurs whenever an officer pursues a driver of a vehicle who has been given a signal to stop by the activation of red lights and siren, and the suspect or violator fails to comply and attempts to elude the officer by taking evasive actions.
\* \* \* \*
*TERMINATE*—A pursuit is considered to be terminated when the officer discontinues the use of all emergency equipment and slows the squad car to the posted speed limit and turns off the pursuit route at the next available intersection.
\* \* \* \*
7–405 (B–D) *INITIATING OR CONTINUING A PURSUIT (11/20/01)*
Officers involved in a vehicular pursuit shall exercise caution and due consider-

ation for the safety of the public. Only marked squads shall be used in a pursuit. Officers shall use red lights and siren in a continuous manner for any emergency driving or vehicular pursuit. The use of red light and siren does not exempt officers from the need for caution.
\* \* \* \*
A pursuit is justified after an offender has engaged in evasive tactics only when an officer knows or has reasonable grounds to believe that the fleeing offender committed an offense and there is a reasonable expectation of a successful apprehension of the offender.
\* \* \* \*
7–408 *TERMINATION OF PURSUITS*
When a pursuit has been terminated, the pursuing officers shall notify dispatch and:
1. Reduce speed to the posted speed limits. (11/20/01)
2. Turn off emergency lights and sirens.
3. Turn off the pursuit route at the next available intersection.

"Officers shall use red lights and siren in a continuous manner for any emergency driving or vehicular pursuit." The policy makes clear that officers have no discretion regarding the use of emergency lights and siren once they have initiated a vehicular pursuit, as the policy imposes an "absolute, certain, and imperative" ministerial duty with which the officers are required to comply. *See Cook,* 200 Minn. at 224, 274 N.W. at 167 (defining ministerial duties). If the officers violated section 7–405 of the policy—a fact unclear from this record—then they are not entitled to official immunity for claims arising from the nonuse of emergency lights and siren. *See Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 316 (Minn.1998) (holding that a city sidewalk inspector's failure to comply with a city ordinance to immediately repair broken a sidewalk defeated the inspector's claim of official immunity).

Therefore, we hold that the Pursuit Policy creates a ministerial duty to continuously operate emergency lights and siren during a "vehicular pursuit" as defined by section 7–404 of that policy. *See Mumm v. Mornson,* 708 N.W.2d 475 at 487 (Minn. Jan. 10, 2006) (holding that a different portion of the Pursuit Policy creates a ministerial duty). However, we remand this case to the district court for trial to determine if the officers initiated such a pursuit, and if they did, whether the officers used the van's emergency lights and siren in the required continuous manner.[3]

Competing versions of the events support different conclusions of what actually happened. Given the state of the record before us, additional analysis as to what in fact occurred would be wholly speculative and call for fact-finding, a task beyond the scope of our review. *See State ex rel.*

*Beaulieu v. City of Mounds View,* 518 N.W.2d 567, 573 (Minn.1994) (remanding the determination of official immunity to a fact finder).

In *Ludwig v. Anderson,* the Eighth Circuit stated that, in the context of qualified immunity, a case should be submitted to the jury when the facts giving rise to the applicability of qualified immunity were disputed. Specifically, the Eighth Circuit stated:

Although it is a question of law whether particular facts entitle police officers to summary judgment based on qualified immunity, where, as here, "there is a genuine dispute concerning predicate facts material to the qualified immunity issue, there can be no summary judgment." The evidence in this case presents material issues of fact on which the issue of qualified immunity turns and "presents a sufficient disagreement to require submission to a jury."

*Ludwig v. Anderson,* 54 F.3d 465, 474 (8th Cir.1995) (citations omitted).

We believe that the Eighth Circuit's reasoning is persuasive and applicable to cases involving claims of official immunity. While we recognize that official immunity is intended to provide "immunity from suit, not just from liability," *Sletten v. Ramsey County,* 675 N.W.2d 291, 299 (Minn.2004), when predicate facts are in dispute, we cannot determine whether official immunity applies until the factual disputes are resolved. *See State ex rel. Beaulieu,* 518 N.W.2d at 573. Therefore, we affirm the court of appeals' denial of summary judgment, reverse the court of appeals' denial of official immunity, and remand the matter to the district court for trial to determine if the officers are entitled to official immunity.

---

**3.** If it is found that the officers in fact initiated a vehicular pursuit of Litz but then attempted to terminate the pursuit, Pursuit Policy section 7–408 may also come into issue.

Affirmed in part, reversed in part, and remanded to the district court for trial.