**Jolene Megan VASSALLO, by and through her Guardian ad Litem, Lisa A. BROWN, Respondent,**

v.

**Jason Lee MAJESKI, et al., Appellants.**

**No. A12–0859.**

Supreme Court of Minnesota.

Feb. 12, 2014.

---

Douglas E. Schmidt, Schmidt Law Firm, Minnetonka, MN, for respondent.

Michael O. Freeman, Hennepin County Attorney, Toni A. Beitz, Senior Assistant County Attorney, Minneapolis, MN, for appellants.

Michael A. Bryant, Nicole L. Bettendorf–Hopps, Bradshaw & Bryant, P.L.L.C., Waite Park, MN, for amicus curiae Minnesota Association for Justice.

John J. Choi, Ramsey County Attorney, Kimberly Parker and Robert B. Roche, Assistant County Attorneys, Saint Paul, MN, for amici curiae Minnesota County Attorneys Association, Association of Minnesota Counties, and League of Minnesota Cities.

OPINION

PAGE, Justice.

This case arises out of a traffic accident that occurred when appellant Hennepin County Sheriff's Deputy Jason Lee Majeski's emergency vehicle struck respondent Jolene Megan Vassallo's vehicle as Deputy Majeski was responding to an emergency call. The central issue presented is whether Deputy Majeski individually, and his employer appellant Hennepin County, are entitled to official immunity and vicarious official immunity, respectively. The specific question presented is whether Deputy Majeski violated a ministerial duty created either by the provisions of Minn.Stat. § 169.03, subd. 2 (2012), or by the policies of the Hennepin County Sheriff's Office, depriving him of the otherwise-applicable immunity. The district court found that, because Deputy Majeski's actions were discretionary and not ministerial and did not involve a willful or malicious wrong, he was entitled to official immunity. The court of appeals reversed and remanded for additional fact finding. Because we hold, based on the undisputed facts, that Deputy Majeski did not violate any ministerial duty created by these statutory and policy provisions, we reverse the court of appeals and remand to the district court for entry of judgment in favor of appellants.

■ On the afternoon of December 25, 2009, Deputy Majeski was driving a K–9 unit vehicle on patrol.[1] Road conditions were poor due to a recent snowfall, with snow and slush in some areas and wet roads in others. Deputy Majeski was informed of a home security-alarm call and a request by local police for K–9 assistance. Shortly thereafter, Deputy Majeski was dispatched to the scene. Upon being dispatched, he turned on his vehicle's emergency lights and siren and headed toward the address of the alarm. Within minutes of being dispatched, he was provided with the location of the individuals suspected of triggering the alarm.

As he approached an intersection near that location, Deputy Majeski observed multiple cars that had pulled over to give way to his vehicle. He did not see any vehicles moving into or out of the intersection. Shortly before he entered the intersection, he heard a general radio broadcast from a police officer indicating that two males were running from officers. Thinking he was close to the suspects, and not wanting to alert them of his presence, Deputy Majeski turned off his siren, but kept the flashing lights on as his vehicle entered the intersection. The vehicle was traveling up to 54 miles per hour in a 50 mile-per-hour speed zone as it approached the intersection, and the light was red when the vehicle entered the intersection.

Upon entering the intersection, Deputy Majeski for the first time saw Vassallo's vehicle coming toward him across the intersection. Deputy Majeski attempted to avoid a collision, but could not. Vassallo's vehicle made no evasive maneuvers. As a result of the ensuing collision, Vassallo sustained extensive injuries and has no memory of the crash.

Vassallo, through her guardian ad litem, commenced this personal injury lawsuit against Deputy Majeski and Hennepin County alleging negligence by Deputy Majeski and vicarious liability on the part of Hennepin County. Deputy Majeski and Hennepin County moved for summary judgment based on official immunity and

---

1. Because the district court granted summary judgment against Vassallo, we review the facts in the light most favorable to her.

*Bearder v. State,* 806 N.W.2d 766, 770 (Minn. 2011).

vicarious official immunity. In response, Vassallo asserted that Deputy Majeski's driving during the emergency response violated statutory and departmental policy provisions, precluding official immunity. Specifically, Vassallo claimed that Deputy Majeski violated the provisions of Minn. Stat. § 169.03, subd. 2,[2] and Hennepin County Sheriff's Office (HCSO) Policy 6–402.[3]

The district court held that, because Deputy Majeski was responding to an emergency, and emergency responses of law enforcement officers are typically discretionary in character, his conduct was protected by official immunity as a matter of law. The district court noted that, although detailed statutory guidance or departmental policies can turn an action that would normally be discretionary into one that is ministerial, thus forfeiting official immunity, the statute and policies at issue here contained language that indicated continuing officer discretion. The district court also held that Deputy Majeski's actions were not willful or malicious. Having determined that Deputy Majeski was entitled to official immunity, the district court concluded that Hennepin County was protected by vicarious official immunity as the employing municipality. Vassallo appealed.

The court of appeals concluded that, while Deputy Majeski was eligible for official immunity as a police officer responding to an emergency, that immunity may have been lost by violating Minn.Stat. § 169.03, subd. 2, and HCSO Policy 6–402. *Vassallo v. Majeski*, No. A12–0859, 2013 WL 399817, at *3–4 (Minn.App. Feb. 4, 2013). Analyzing the provisions in tandem, the court of appeals found they could be construed as creating a ministerial duty. *Id.* at *4. It did not, however, decide whether the provisions in fact created any ministerial duties that would preclude immunity. *Id.* Instead, the court held that there was a fact question as to whether Deputy Majeski "slow[ed] down as necessary for safety" and "proceed[ed] cautiously" thereafter as required by Minn.Stat. § 169.03, subd. 2, *Vassallo,* 2013 WL 399817, at *3–4. Relying heavily on our decision in *Travis v. Collett,* 218 Minn. 592, 595–96, 17 N.W.2d 68, 71 (1944), the court of appeals held that it was "premature" to determine whether the requirements of Minn.Stat. § 169.03, subd. 2, and HCSO Policy 6–402 are ministerial or discretionary because "a jury must first determine whether Deputy Majeski proceeded cautiously through the intersection as required by public safety." 2013 WL 399817, at *4. The court of appeals, therefore, reversed and remanded the case for trial. *Id.* at *2. We granted review to address whether the court of appeals' remand was proper.[4]

2. That subdivision provides:
 The driver of any authorized emergency vehicle, when responding to an emergency call, upon approaching a red or stop signal or any stop sign shall slow down as necessary for safety, but may proceed cautiously past such red or stop sign or signal after sounding siren and displaying red lights, except that a law enforcement vehicle responding to an emergency call shall sound its siren or display at least one lighted red light to the front.
 Minn.Stat. § 169.03, subd. 2.

3. HCSO Policy 6–402 provides in part:

 Only vehicles with red lights and siren are authorized for emergency response. The use of both red lights and siren is required when responding to an emergency. Deputies are required to drive with due regard for the safety of all persons.

4. Appellants moved to strike certain materials from Vassallo's brief, including references to a newspaper article about an unrelated crash that occurred after the record in this case was submitted on appeal; argument regarding the existence of the emergency to which Majeski was responding; and argument regarding HCSO policies other than HCSO Policy

■ The application of immunity is a question of law we review de novo. *Gleason v. Metro. Council Transit Operations,* 582 N.W.2d 216, 219 (Minn.1998). In an appeal from summary judgment, we must determine whether there are genuine issues of material fact and whether the district court erred in applying the law. *Thompson v. City of Minneapolis,* 707 N.W.2d 669, 673 (Minn.2006).

■ Under the doctrine of official immunity, "a public official charged by law with duties which call for the exercise of his [or her] judgment or discretion is not personally liable to an individual for damages unless he is guilty of a willful or malicious wrong." *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11,* 678 N.W.2d 651, 655 (Minn.2004) (quoting *Elwood v. Cnty. of Rice,* 423 N.W.2d 671, 677 (Minn.1988)) (internal quotation marks omitted). Official immunity is intended to enable public employees to perform their duties effectively, without fear of personal liability that might inhibit the exercise of their independent judgment. *Anderson,* 678 N.W.2d at 655. The "immunity [is] from suit, not just from liability." *Sletten v. Ramsey Cnty.,* 675 N.W.2d 291, 299 (Minn.2004). Official immunity can apply to any act that involves an exercise of independent judgment, even at the "operational level." *Anderson,* 678 N.W.2d at 657.

We have held that whether official immunity applies turns on: (1) the conduct at issue; (2) whether the conduct is discretionary or ministerial and, if ministerial, whether any ministerial duties were violated; and (3) if discretionary, whether the conduct was willful or malicious. *See Mumm v. Mornson,* 708 N.W.2d 475, 490 (Minn.2006) (citing *Elwood,* 423 N.W.2d at 679). Here, it is undisputed that the conduct at issue is Deputy Majeski's driving and his operation of his vehicle's lights and siren when responding to the emergency call. *See Vassallo,* 2013 WL 399817, at *3. Thus, our first task is to determine whether Deputy Majeski's conduct in operating his vehicle's lights and siren was discretionary or ministerial.

■ When determining whether conduct is discretionary or ministerial, we "focus ... on the nature of the act." *Mumm,* 708 N.W.2d at 490 (quoting *Anderson,* 678 N.W.2d at 656) (internal quotation marks omitted). A discretionary duty involves "individual professional judgment that necessarily reflects the professional goal and factors of a situation." *Id.* at 490–91 (quoting *Wiederholt v. City of Minneapolis,* 581 N.W.2d 312, 315 (Minn.1998)) (internal quotation marks omitted). By contrast, a "ministerial" duty is "one that is 'absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts.'" *Anderson,* 678 N.W.2d at 656 (quoting *Wiederholt,* 581 N.W.2d at 315) (internal quotation marks omitted).

■ Official immunity typically protects the conduct of public officials responding to emergencies on the grounds that emergency conditions offer "little time for reflection" and often involve "incomplete and confusing information" so that the situation requires "the exercise of significant, independent judgment and discretion." *Pletan v. Gaines,* 494 N.W.2d 38, 41 (Minn.1992). However, we have rejected the argument that "all police conduct in emergencies is discretionary," recognizing that "governmental entities have the authority to eliminate by policy the discretion of their employees" in emergency

6–402. Because the objected-to article is outside the record and the arguments exceed the proper scope of the issues on review, we grant appellants' motion to strike.

situations. *Mumm,* 708 N.W.2d at 493. The existence of a government policy that "sets a sufficiently narrow standard of conduct will make a public employee's conduct ministerial if he is bound to follow the policy." *Id.* at 491 (citing *Anderson,* 678 N.W.2d at 659).

The court of appeals considered two government "policies": Minn.Stat. § 169.03, subd. 2, and HCSO Policy 6–402, that Vassallo claimed created ministerial duties applicable to Deputy Majeski.[5] *Vassallo,* 2013 WL 399817, at *3–4. We address each in turn.

 The court of appeals concluded that whether Deputy Majeski complied with the policy set out in Minn.Stat. § 169.03, subd. 2, that when approaching a stop signal or sign the driver of an authorized emergency vehicle "shall slow down as necessary for safety," created a genuine issue of material fact preventing summary judgment on Deputy Majeski's official immunity defense. *Vassallo,* 2013 WL 399817, at *4. In doing so, the court of appeals answered the wrong question.

 At this stage of the analysis, the task is to determine whether Minn. Stat. § 169.03, subd. 2, creates a ministerial duty or a discretionary one, not to determine whether any such duty was violated. Whether a particular statute or policy creates a ministerial duty is ordinarily a question of law. *Kelly v. City of Minneapolis,* 598 N.W.2d 657, 664 n. 5 (Minn. 1999). Minnesota Statutes § 169.03, subd. 2, contains a mixture of discretionary and ministerial elements. The requirement that the driver of an authorized emergency vehicle "shall slow down as necessary for safety," "plainly does not impose an absolute duty upon the driver of an emergency

vehicle to slow down in every situation upon approaching a red or *'Stop'* signal or stop sign." *Travis,* 218 Minn. at 595, 17 N.W.2d at 71; *see also Markle v. Haase,* 245 Minn. 520, 524, 73 N.W.2d 362, 365 (1955). Rather, the requirement is conditioned on the driver's, in this case Deputy Majeski's, determination of the level of speed appropriate for safety under the circumstances. This is a textbook example of the exercise of discretion: the policy set out in the statute requires "individual professional judgment that necessarily reflects the professional goal and factors of a situation," *Mumm,* 708 N.W.2d at 490–91 (quoting *Wiederholt,* 581 N.W.2d at 315) (internal quotation marks omitted), and is therefore discretionary. Likewise, the duty to "proceed cautiously," as used in this statute, "means to go forward in the exercise of *due care* to avoid a collision." *Rogers v. Minneapolis St. Ry. Co.,* 218 Minn. 454, 459, 16 N.W.2d 516, 519 (1944). A requirement to use due care also calls for the exercise of independent judgment and is not "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts." *Anderson,* 678 N.W.2d at 656 (quoting *Wiederholt,* 581 N.W.2d at 315) (internal quotation marks omitted).

 By contrast, the requirement set out in Minn.Stat. § 169.03, subd. 2, that an emergency vehicle "shall sound its siren or display at least one lighted red light to the front" before proceeding, *is* absolute, certain, and imperative, and therefore ministerial. But Deputy Majeski's conduct did not violate this duty: the record is clear and undisputed that Deputy Majeski's front red flashing lights were on at the time he entered the intersection. We conclude, therefore, that the duty created by

---

5. The court of appeals found that other policies relied on by Vassallo are inapplicable to this case. *Vassallo,* 2013 WL 399817, at *4.

We denied Vassallo's petition for cross-review, so we do not address those other policies here.

Minn.Stat. § 169.03, subd. 2, to slow down and proceed cautiously is discretionary, and the duty to sound the siren or display at least one lighted red light to the front before entering the intersection, while ministerial, was fulfilled.

Vassallo also claims that Deputy Majeski violated HCSO Policy 6–402. Vassallo argues that the policy's provision that "use of both red lights and siren is required when responding to an emergency" creates a ministerial duty that Deputy Majeski violated by turning off his siren before entering the intersection. As noted previously, a ministerial duty is "simple and definite, leaving nothing to the discretion of the official." *Kelly,* 598 N.W.2d at 664 (citing *Cook v. Trovatten,* 200 Minn. 221, 224, 274 N.W. 165, 167 (1937)).

 In *Thompson v. City of Minneapolis,* 707 N.W.2d 669 (Minn.2006), we held that a policy similar to the Hennepin County policy at issue here created a ministerial duty. In *Thompson,* the relevant policy provided that: "Officers shall use red lights and siren *in a continuous manner* for *any* emergency driving or vehicular pursuit." 707 N.W.2d at 675 (emphases added). The policy at issue in *Thompson* is distinguishable from the Hennepin County policy in one significant respect. By requiring that red lights and siren be used in a continuous manner, the policy in *Thompson* clearly left nothing to discretion. In contrast, HCSO Policy 6–402 does not require that red lights and siren be used in a continuous fashion, leaving open the question of whether the use of both red lights and siren is required *at all times* during an emergency response. In this way, it is markedly different from the policy in *Thompson.* That is especially so when the requirement for the "use of both red lights and siren" is read in conjunction with the surrounding provisions of HCSO Policy 6–

402. *See, e.g., Van Asperen v. Darling Olds, Inc.,* 254 Minn. 62, 74, 93 N.W.2d 690, 698 (1958) (noting that "various provisions of the same statute must be interpreted in the light of each other"). The final sentence of HCSO Policy 6–402 obligates deputies "to drive with due regard for the safety of all persons." As with the requirements under Minn.Stat. § 169.03, subd. 2, to "slow down as necessary for safety" and to "proceed cautiously," a requirement to use "due regard" invites individual professional judgment that necessarily involves the exercise of discretion. Reading the plain language of HCSO Policy 6–402 as a whole, including its lack of explicit language requiring that both an emergency vehicle's lights and siren be in continuous or constant use at all times during an emergency response, and observing that Deputy Majeski used his vehicle's lights and siren during the emergency response that culminated in the collision with Vassallo's vehicle, we conclude as a matter of law that Deputy Majeski did not violate any ministerial duty created by HCSO Policy 6–402.

Finally, while not critical to our decision, we note that the record in this case supports our interpretation that under HCSO Policy 6–402, Deputy Majeski had discretion to turn off his vehicle's siren, as he did in this case. Deputy Majeski testified that it was consistent with his HCSO-sponsored field training to turn off the siren to avoid alerting suspects that he was near. The head of the HCSO standards division agreed. Importantly for purposes of summary judgment, no officer testified nor was there any other evidence that in practice, HCSO Policy 6–402 required officers to use the siren continuously throughout an emergency response.

The dissent argues that the plain language of this policy compels the use of red lights and siren at all times during an

emergency response. We disagree with the dissent's position that the policy's plain language sets forth a "sufficiently narrow standard of conduct" depriving officers of discretion. Although the policy clearly requires that both red lights and siren be turned on at some point during an emergency response, the policy does not speak directly to whether continuous use is required. If the policy was intended to deprive officers of discretion to turn their lights and siren off at any time during an emergency response, it could have said so, whether by use of the words "in a continuous manner," as in *Thompson,* or other words denoting constant or continuous use. It contains no such words, and we therefore conclude that it fails to create a duty that is "absolute, certain, and imperative." Thus, as to *continuous* use of red lights and siren, the policy does not create a ministerial duty.

Because Deputy Majeski did not, as a matter of law, violate a ministerial duty, we proceed to the third step of the official immunity inquiry, which requires us to determine whether the challenged conduct constituted a "willful or malicious wrong." *Anderson,* 678 N.W.2d at 655. In entering summary judgment for Deputy Majeski and Hennepin County, the district court found that Deputy Majeski's conduct was not willful or malicious. Although Vassallo properly raised this issue on appeal, the court of appeals, having reversed on other grounds, did not address it, finding that the question was premature. Because we hold that Deputy Majeski did not violate any ministerial duty, the question of whether his conduct was willful or malicious must now be answered.

■■■ Malice is not negligence. It is "the intentional doing of a wrongful act without legal justification or excuse, or, otherwise stated, the willful violation of a known right." *Rico v. State,* 472 N.W.2d

100, 107 (Minn.1991) (citation omitted) (internal quotation marks omitted). The exception to immunity for malicious acts allows liability "only when an official intentionally commits an act that he or she then has reason to believe is prohibited." *Id.* In order to find malice, the court must find that "the wrongful act so unreasonably put at risk the safety and welfare of others that as a matter of law it could not be excused or justified." *Kari v. City of Maplewood,* 582 N.W.2d 921, 925 (Minn.1998). Having carefully reviewed the record, we conclude that the district court did not err in finding as a matter of law that Deputy Majeski's actions were not willful or malicious. The undisputed facts are that Deputy Majeski simply failed to see Vassallo's car until the last minute, and then made every effort to avoid her. There is no evidence that he willfully or maliciously violated a known right. *See Kari,* 582 N.W.2d at 925.

■■■ Likewise, the parties agree that the issue of Hennepin County's immunity stands or falls with Deputy Majeski's immunity. *See Watson v. Metro. Transit Comm'n,* 553 N.W.2d 406, 415 (Minn.1996) ("Where an employee or agent is protected by official immunity, the government entity will not be called on to indemnify that individual nor will the government entity be liable under the doctrine of respondeat superior."). Accordingly, our decision that Deputy Majeski is entitled to official immunity means that Hennepin County is entitled to vicarious official immunity as well, and the court of appeals' ruling to the contrary was erroneous.

Because we hold that Deputy Majeski did not violate any ministerial duty set out in Minn.Stat. § 169.03, subd. 2, or HCSO Policy 6–402, we reverse the decision of the court of appeals and remand to the

district court to enter judgment in favor of Deputy Majeski and Hennepin County.

Reversed and remanded.

ANDERSON, Justice, dissenting.

I agree with the court's framework of analysis, including its rejection of the court of appeals' decision to address the violation of a duty before determining if the duty was ministerial or discretionary. I also largely agree with the classifications of the duties as determined by the majority, but I believe that the plain language of the portion of Hennepin County Sheriff's Office (HCSO) Policy 6–402 requiring the use of both red lights and siren during an emergency response creates a ministerial duty. Although Deputy Majeski and Hennepin County have introduced some evidence that this written policy was modified by unwritten policies that made the meaning of "use" more discretionary, given our standard of review, this evidence is not conclusive enough to support summary judgment. Therefore, because there is a genuine issue of material fact regarding the existence and content of unwritten policies related to HCSO Policy 6–402, I would reverse and remand for further proceedings.

## I.

This case is presented on official immunity grounds. Because official immunity and the closely related concept of statutory immunity are often conflated, it is helpful to understand the separate purposes behind each concept. Statutory immunity was created as part of a move away from broader sovereign immunity, which originated in the ancient precept that "the king can do no wrong." *See Langford v. United States,* 101 U.S. 341, 342–43, 25 L.Ed. 1010 (1879) (holding that the English con-stitutional maxim "the king can do no wrong" is inapplicable under our constitutional system). As states sought to abolish full sovereign immunity, statutes such as Minn.Stat. § 466.02 (2012) were enacted. This statute permits broad government liability for torts, stating, "[E]very municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a governmental or proprietary function." *Id.* But such broad liability created concern about the separation of powers, as the rise in litigation surrounding government conduct would increase judicial oversight of executive and legislative actions. Michael K. Jordan, *Finding a Useful Path Through the Immunity Thicket,* Bench & B. Minn., Oct. 2004, at 24, 26. This was of particular concern for executive and legislative responsibilities that involved resolving policy issues through the political process. *Id.* at 26. To protect policymaking functions from judicial review, an exception to government liability was carved out in Minn.Stat. § 466.03, subd. 6 (2012), for "[a]ny claim based upon the performance or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." In this context, discretion refers not to the mere exercise of independent judgment, but specifically to such judgment used in the context of policymaking. *Elwood v. Cnty. of Rice,* 423 N.W.2d 671, 678 (Minn.1988).

In contrast with the underlying rationale for statutory immunity, official immunity allows public employees to perform duties that require personal judgment without fear of personal liability. *Anderson v. Anoka Hennepin Indep. Sch. Dist. 11,* 678 N.W.2d 651, 655 (Minn.2004). As this court has stated:

> Both doctrines are phrased in terms of whether discretion was involved, but

they are based on entirely different rationales. Governmental [statutory] immunity rests on the need to protect policymaking activities that involve a balancing of social, political or economic considerations. Official immunity, on the other hand, protects public officials from the fear of personal liability that might deter independent action and impair effective performance of their duties.

*Elwood,* 423 N.W.2d at 678 (citations omitted). In the context of official immunity, unlike statutory immunity, discretion is not limited to policymaking decisions, and official immunity can apply to any act that involves a significant exercise of independent judgment.[1] *Anderson,* 678 N.W.2d at 657. But official immunity does not apply to violated ministerial, or nondiscretionary, duties, and it does not protect willful or malicious discretionary acts. *Id.* at 660–62. As the majority correctly notes, a duty is classified as ministerial if it is "absolute, certain, and imperative, involving merely the execution of a specific duty arising from fixed and designated facts," and therefore does not involve any significant exercise of independent judgment. *Cook v. Trovatten,* 200 Minn. 221, 224, 274 N.W. 165, 167 (1937). We have also considered if the duty was "simple and definite," including the "nature, quality, and complexity of [the] decision-making process." *Williamson v. Cain,* 310 Minn. 59, 61, 245 N.W.2d 242, 244 (1976).

## II.

Law enforcement officials and drivers of emergency vehicles responding to an emergency are usually given wide discretion in their actions. *See Mumm v. Mornson,* 708 N.W.2d 475, 492 (Minn.2006). The need for discretion in emergencies stems from the necessity of making quick decisions, often with imperfect information, in situations in which hesitation or inhibition may result in significant harm to the public. *See Kari v. City of Maplewood,* 582 N.W.2d 921, 923–24 (Minn.1998). But discretion in emergencies can be limited by detailed policies that require specific actions. *See Mumm,* 708 N.W.2d at 491–92; *Thompson v. City of Minneapolis,* 707 N.W.2d 669, 675 (Minn.2006).

In this case, some of Deputy Majeski's duties were created by internal department policies on emergency responses. Hennepin County Sheriff's Office Policy 6–402 provides, as relevant here, "The use of both red lights and siren *is required* when responding to an emergency." (Emphasis added.) As with a statute, the proper interpretation of a county policy begins with the plain language. *See Mumm,* 708 N.W.2d at 491 n. 14 (examining the plain language of a department policy). Black's Law Dictionary defines "use" as "[t]he application or employment of something." *Black's Law Dictionary* 1681 (9th ed.2009). Thus, the policy requires that both red lights and siren be employed, which under the common understanding means both should be turned on. The majority argues that the lack of language such as "in a continuous manner" or "at all times" means that the officer has discretion as to when to employ the lights and sirens, suggesting that they need only be employed at some point during the response. But this

---

1. Whether such a wide sweep of immunity remains appropriate as the scope of government increases is a question I save for another day. While emergency responses are a natural place to retain officer discretion, I am concerned that local governments could, in theory, immunize a vast amount of official conduct simply by creating internal policies that authorize discretion. Here I simply note that "[a]s the role of government has expanded over time, so too has the opportunity for official misconduct." *See* Note, *Government Tort Liability,* 111 Harv. L.Rev.2009, 2009 (1998).

interpretation ignores the temporal element that is included in the policy—"when responding to an emergency." Thus, the plain language is clear that when an emergency response is required, both the red lights and a siren must be activated. The duty to have both activated does not end until the temporal element included in the policy—"when responding to an emergency"—ends. This specific and concrete action is "required," which removes the discretion of officers and creates a ministerial duty as an absolute and certain imperative.[2]

The majority does not explicitly classify the duty to use red lights and a siren as either ministerial or discretionary, instead stating more or less simultaneously that Deputy Majeski "did not violate any ministerial duty created by HCSO Policy 6–402" and that "Deputy Majeski had discretion to turn off his vehicle's siren." The majority is unable to directly characterize whether the duty is ministerial or discretionary because labeling the duty as discretionary ignores the clear ministerial language of the policy, including that the "use . . . is required." And classifying the duty as ministerial would force the majority to define what the policy means when it says "use . . . when responding to an

emergency" if that language does not refer to the plain meaning of continuous use. By avoiding a direct characterization of the nature of the duty, the majority runs afoul of its own guidance that the "first task is to determine whether Deputy Majeski's conduct in operating his vehicle's lights and siren was discretionary or ministerial." The majority has needlessly complicated this task by reading discretionary elements into the lights and siren portion of HCSO Policy 6–402 that are simply not consistent with the plain meaning of the policy. Thus, I would hold that HCSO Policy 6–402, requiring the use of red lights and a siren during an emergency response, creates a ministerial duty on its face.[3]

## III.

Because the majority mentions in passing that there is evidence in the record suggesting that Deputy Majeski's actions in turning off the siren were consistent with his field training, a word needs to be said about modification of written policies by unwritten policies. In *Anderson v. Anoka Hennepin Independent School District 11*, we held that an unwritten department policy on the disengagement of a

**2.** Although the majority claims that the use of lights and a siren is affected by the discretionary duty to drive with "due regard for the safety of all persons" contained in the next sentence, there is no reason why HCSO Policy 6–402 cannot contain both discretionary and ministerial duties. Carving a ministerial duty out of a general category of discretionary acts is not only possible, it also follows the pattern of its counterpart in Minn.Stat. § 169.03, subd. 2 (2012), in which officers use discretion to drive "as necessary for safety," but are specifically required to use a red light or siren before entering an intersection on a red light.

**3.** The rationale behind the inclusion of a ministerial duty to provide warning to other vehicles and pedestrians during an emergency response is not difficult to discern. Minneso-

ta Statutes § 169.03 (2012) exempts emergency vehicles from certain traffic regulations during an emergency response.. This exemption, while perhaps necessary for overall public safety, does not come without cost, including the risk of death and serious injury for bystanders and others not involved in the emergency. The National Highway Traffic Safety Administration reports that in 2011, 108 people were killed in accidents involving emergency response vehicles. Nat'l Highway Traffic Safety Admin., *Traffic Safety Facts 2011* 96 tbl. 61 (2013). In Minnesota alone, there were 116 injury-causing accidents involving police vehicles in 2012. Minn. Dep't of Pub. Safety, *Minnesota Motor Vehicle Crash Facts 2012* 20 tbl. 1.12 (2013).

table saw blade guard formed the basis of a ministerial duty. 678 N.W.2d at 658. This unwritten policy had been "discussed in staff meetings regarding safety policies at the beginning of the school year and throughout the year," and was referenced in a safety test given to students. *Id.*

It is certainly correct to note that there is evidence of unwritten policies and training that conflict with the plain language of HCSO Policy 6–402. But this dispute comes to us on summary judgment and the record also contains contrary evidence on this point. Deputy Majeski testified that in training he was also told that "[a]ny time that you would—you exceed state and local traffic laws in response to getting a call, you need to activate your emergency red lights and sirens." This explanation implies that Deputy Majeski was trained to keep the lights and siren activated as long as he was violating traffic laws, as when running a red light. Another officer testified that he had been told that it was permissible to turn off the siren before the lights, but the only example of a situation he could think of in which that would apply is when the light and siren functions are controlled by two different switches, forcing the operator to turn off one before the other with a momentary delay in between. That officer specifically denied he had ever been told that there are any other exceptions to HCSO Policy 6–402. Likewise, the head of the HCSO Professional Standards Division stated, "By these rules, you have to use both your red lights and your siren," and stated that although in theory there could be some unwritten exceptions to this, she could not provide any exceptions or examples of a situation in which it would be permissible to operate one without the other during an emergency response.

While there is some evidence that unwritten policies may have created excep-

tions to HCSO Policy 6–402, the content of these unwritten directives, and perhaps whether the directives even exist, is unclear based on the contradictory record. Given the conflicting evidence and our summary judgment standard of review, I would conclude that the court of appeals should be affirmed as modified and the matter remanded to the district court for further proceedings on the issue of whether HCSO Policy 6–402 was modified by any unwritten policies.

Because I conclude that the plain language of HCSO Policy 6–402 creates a ministerial duty to use red lights and a siren during the entire course of an emergency response, I respectfully dissent.

STRAS, Justice (dissenting).

I join in the dissent of Justice Anderson.

WRIGHT, Justice (dissenting).

I join in the dissent of Justice Anderson.